Our fourth and final case on the docket today is agenda number 12, case number 111903, Wirtz v. Quinn. Counsel? May it please the Court, I am Assistant Attorney General Richard Hosek, counsel for the defendants in this case. And I urge the Court to reverse the appellate court's judgment and to hold that each of the acts challenged by the plaintiffs in this case satisfies the single subject clause of the Illinois Constitution. This is, in fact, an issue that the plaintiffs have to address. It is an issue that the appellate court did not address along the lines that we are asking the court to reverse that judgment. Focusing on the subject of the capital program that was not only the subject of the bill that the appellate court declared unconstitutional, but essentially all of the other challenged acts as part of a comprehensive package to implement the governor's capital budget and then to provide revenues for the new programs included in that budget, the increased funding for financing to support both those programs and other preauthorized programs, and then the first year's fiscal year's appropriations for that. The first issue, of course, under the two-step analysis for the single subject clause is whether the 2009 capital program is a valid subject under the Constitution. If it's not a valid subject, the court needn't go no further. 9634 is invalid in its entirety. We respectfully submit that that is not the conclusion that this court should reach. The appellate court addressed whether some other subject would be a valid one and whether the provisions of 9634 related to that subject, the subject of revenue. We are defending the statute on the ground that the relevant, valid subject of 9634 is the capital program. Chicago architect Dan Burnham famously once said, make no little plans. The plaintiff's approach to the single subject clause appears to be the opposite, that the General Assembly can only make little plans. That if there is a capital program that is comprehensive along the lines that is reflected in these bills, and in particular 9634, that is too broad, that is too comprehensive. It negates the purpose of the single subject clause. We respectfully disagree. We think that the single subject clause under this court's precedent should be liberally construed. It does not unduly restrict or handicap the legislative scope of action. And it is comprehensive in its scope, provided, however, that the subject does not become so meaninglessly broad and nebulous that it renders the constitutional protection meaningless. And I think the best example of that is when the court, I believe in the Johnson case, struck down a statute where the defended justification or subject for it was governmental matters. Under that rubric, essentially everything goes, anything goes, and the provision no longer has any teeth to it. How much weight should we give to the title that the legislature gives to the bills? I don't think it's given any legal weight. It should be given, it should be looked to as sort of some guidepost as to what the legislative intention was. It used to be that the title of the subject was controlling under the 1870 Constitution and jurisprudence related to it, but that's no longer the case. And the court has said that a permissible subject can be sustained if the substantive provisions of the act relate to that subject. And so I think that was in part where the appellate court may have focused, we believe excessively, on the stated subject of Public Act 96-34, which says it's an act relating to revenue. Clearly, the vast majority of its provisions do relate to revenue, but that's not all it does. It also, without addressing the constitutional line drawing here, as a pragmatic matter, it also established the capital projects fund in the state treasury under the State Finance Act, and it provided for the governor to provide periodic reports with respect to the programs that were being implemented and authorized under Public Act 96-37, for example, which authorized a number of programs within the scope of the 2009 capital program. We believe that the Arangold case is faithful to the principles that we've articulated and supports our position, which is that the subject of a capital program here is a valid one. Now, the appellate court, without expressly saying so, seemed to indicate that Arangold is sort of a one-off sui generis exception to the single subject clause, pursuant to which budget implementation acts alone are allowed to have a broad scope with many programs amending many other acts. We don't read the case that way. We read it as being faithful to the principles that the subject portion of the test should be liberally construed. But doesn't Arangold require that the subject implicate all of the acts provisions in a similar way? No. I think what Arangold says is that they all have to be pointed towards a similar goal, which is reflected in that subject. And so in that case, the subject was implementation of the budget for that fiscal year. But the court's decision reflects the many, many, many programs that were added to, expanded, changed, reduced, not just in ways that toted up increased funding or reduced funding or increased expenditures, but really made major programmatic changes as well. And so our view of Arangold is that the subject can be quite broad, provided it doesn't become meaninglessly nebulous, and that if you do have a valid subject, then the real test becomes whether all the individual provisions have a logical and natural relationship to that valid subject. And the court has struck down some statutes that run afoul of that principle, because the provisions relating to hospital liens and amendments to the criminal code, for example, just don't possibly relate to a single valid subject. I think it's worth noting that the Illinois statutes include a capital budget act that directs the governor to prepare a capital budget separate from just the annual operations budget and to compile the state agency's request for capital expenditures, to look at the programs, to make an estimate of what the revenues necessary would be and what the projected expenditures would be, to deliver that to the General Assembly. In this case, that's what the governor did. Well, if that's the case, then what, and the amendment to the University of Illinois, how is that a connection?  Well, to implement a capital program, in this case, the legislature did something that we believe is not only sensible from a common sense perspective, but also appropriate constitutionally, which is to say we're not going to spend a whole bunch of money on all these new programs without revenues for them. And so when they outlined all the programs, they had to add to it sources of new funding, not just tacking on new debt without any money to pay for it. And in essence, then, you have the coming together of the new revenues established by 9634, the new programs in 9637, which includes the first program you mentioned, the university program for expanding. Setting the lottery. And the lottery is different. That is really a revenue program. The idea being that existing lottery revenues adjusted for inflation would continue to go to the same purposes to which they were previously devoted, which includes funding for the state schools, the public schools, but that there was going to be a partial privatization of the day-to-day management, not overall control of the lottery, but the day-to-day management of the program. And that 5% of the net state lottery revenues would go to the private manager, the idea being that privatization sometimes makes sense. It's good to bring in sort of fresh blood and fresh ideas and entrepreneurial spirit. But the concern here is if you're referring to the study by the university about the lottery effect on families, that does bear a logical and natural relationship to this new revenue-raising mechanism because the legislature was concerned that if you get sort of this entrepreneurial spirit carried a little too far and they start to promote and market the lottery in ways that encourages people perhaps to do things that are unhealthy for them financially, that it could have a negative effect on Illinois families. And so the idea was let's try and raise new revenues in this fashion, but let's not do it in a reckless fashion. And so the study is intended to ensure that there is not a negative impact on Illinois families from conducting the lottery. Is that also true with the Illinois Vehicle Code changes on truckload and weight? We submit that it is. And again, our position is that the plaintiffs have sort of taken a myopic view. They'll look at one provision in isolation, focus on it exclusive of the rest of the enactment, and then claim that it cannot possibly have a natural and logical relationship to the rest of the statutory program. But we disagree. And in that case, it's important to realize that one of the major new sources of revenues for the capital program was increases in the fees and fines under the Motor Vehicle Code. But those revenues were also being used to fund improvements to the roads, bridges, and highways in the state. And the argument, essentially, or the reasoning was if we're going to be improving, you know, decrepit and at-risk roads and bridges and highways, we also, and we're going to be charging people, you know, higher fines for violating the weight limits. If we're improving those roads and bridges, then it makes sense, especially if we're going to nail somebody with a higher fine for violating the weight limits, to give them also a little bit the benefit of those infrastructure improvements. If you're going to improve the roads and bridges, you can increase the weight limits modestly, and I think the statute reflects that these are modest increases, and that corresponds with this overall goal of raising the revenues, using those revenues to do the work, but also making sure that the work has a public benefit collectively. And in this case, it's better roads and bridges, so the weight limits have gone up a slight bit. The plaintiffs in their brief in this court, under the logical and natural relationship test, challenge really only two aspects of Public Act 9634. These others are not in their brief, and we're not sure why they dropped them off the table. We would submit that the court need not then resolve them, but obviously, you know, the forfeiture issues are ones for the court to resolve. But the two that they do specifically attack in their brief are the claim that some of the revenues, some small portion of the revenues from increases in the taxes on candy, soft drinks, hygiene, and grooming products is just going to the general revenue fund for whatever purpose the government wants to spend it on, and they make the same claim with respect to some of the monies that come into the capital projects fund. Let me address those separately. The first one is one that we've never seen before. It arises for the first time in this court, and we would submit that not having been raised below or addressed by the appellate court, that really has been forfeited. But in any event, it really has no merit. The goal of raising the taxes on this short list of products clearly was to use the additional revenues generated by those to go into the capital projects fund, and that's exactly what happens to pay for the programs that this package of bills implements. But they had to work against an existing template for the tax structure for imposing sales and use taxes or retailers' occupation and use taxes. And under that template, there are two tax levels, and retailers and the Department of Revenue, within those two tax levels, don't make a product-by-product differentiation with a master computer that then tracks which penny from which product goes to which destination. They are done in large baskets, and that's a logical and pragmatic way of doing it. And so in this case, the state was already getting a nickel out of the sales tax,  but when you shift from a penny to 6.25%, the additional 0.25% for products that were already subject to that taxation was going to the counties and mass transit fund, which pays for the RTA in Chicago and the surrounding area, and then it goes to the counties. That's a very small portion, but the important point is that that can't have been anything other than an incidental byproduct. And a small one at that of implementing this goal of generating additional revenues for the capital projects fund and these new projects in the most sensible and even the only pragmatic way that that could be done, which is to move these products from one category to the other category, provide that an estimate of the 5% that the state gets on these new products would then go to the capital projects fund because there isn't a product-by-product, sale-by-sale tracking of it, and then let the rest be implemented according to the preexisting statute. That is so far afield from violating the single subject rule by lacking a necessary and logical connection. I think the court can readily conclude that this was done in a way that easily satisfies that standard. The other challenge is to the twin provisions that both terminate road fund diversions that historically had gotten to $245.2 million to the Secretary of State and to the Illinois State Police, simultaneously terminating those and then also providing that the same amount of money would go out of the capital projects fund to the general revenue fund. And even in one of the appropriation bill items subsequent to that, the legislature makes it clear that their appropriation to one of those two state agencies out of the general revenues is to make up for the money that used to be coming out of the road fund. Now, the road fund is largely used for transportation products, including construction, capital infrastructure, but also some operations related to the road. And that was the historic justification for the state police and for the Secretary of State that promoted safety on the roads to have some of their operations paid for out of the road fund. But if they were going to try and make sure that road fund monies in the future would be used for capital projects, and a major use of the road fund is to repay or service the debt on road bonds used for road construction. And in fact, since this program took effect, there's been $1.6 billion in road funds issued, and that's getting paid out of transportation bonds that are being paid out of the road fund. So if they're going to try and secure these revenue sources for the road fund by terminating the diversions elsewhere, those operations elsewhere didn't stop. So they needed to find some other way of covering that. And the way they did that was, I think, a reasonably logical and necessary way of doing it, which is saying no more diversions, but some of the money that is now going to go into the general revenue fund. It's tantamount to saying this amount of money goes straight to the road fund, although they did it in a two-step indirect approach. The plaintiff's argument in this court now is finally that those numbers, which are virtually identical, the money that goes to the general revenue fund is, I think, a few thousands less than the 245.2 million diversions that are ended. Their argument is, well, the diversions were previously maxed out by statute, and so you should really count some lower number than the one that the legislature used. And our response to that is a very practical one. They had been maxed out by statute previously, repeatedly, and the legislature had repeatedly overridden those limitations, and what it had done was appropriate 245.2 million out of the road fund for these purposes. And in doing this sort of equivalency transfer, it was appropriate for the legislature to say, let's look at what we've been doing rather than what we said we would do, but never really did year after year. So those, I think, are the main focuses of the natural and logical connection test that the plaintiffs focus on in this court, and we think that each of those satisfactorily meets the constitutional test of there being a natural and logical connection. They have, in the lower court, alluded to other provisions that they think are unsatisfactory, and I would submit that our brief addresses those. Our opening brief actually anticipatorily addresses those, and if the court has any further questions about specific provisions, the end of sweeps from the underground storage tank leaking trust fund, you know, that type of thing, I'd certainly be glad to address them, but we believe that we have included in our briefs before the court a satisfactory description or explanation of those. Before you move on then, maybe we can back up to Justice Burke's earlier question about the lottery study. I think that's the provision that's in Section 935 of the Omnibus Act. Is that right? I believe that's correct. I haven't memorized all the section numbers. Well, I mean, it's a huge piece of legislation, so I hope I'm tracking this right. And if I'm looking at the right section about 935, it amends 12.5 on the study of the effect of the lottery on Illinois families. Was there a tie-in somehow that the lottery would pay in part some of this capital project? Because I don't see any language, if that's your argument, in Section 12.5. That's part of 935 of the entire act. The study is not in the same provision that relates to the increase in the lottery funds going to the capital projects fund, but it is related to it in sort of a thematic sense. To this extent, if this new change in the way the lottery is operated, with partial privatized management of the day-to-day operations, was intended to generate additional revenues, and those additional revenues over the inflation-adjusted baseline were going to go into the capital projects fund, this provision relates to it in substance by trying to make sure that the legislature and the government know whether the operation of the lottery, although having a salutary financial benefit, does not have a deleterious effect on Illinois families. I mean, I'm sure everybody has heard the story that the lottery is sort of a regressive tax on the poor. The people that play the lottery are the ones who have the least means and can least afford it, but that's their choice in our society and the legislature has allowed them to do that. But at the same time, while that choice is being put out there and much of the money goes to the school system, they want to reassure themselves that they're not eroding the integrity of Illinois families. And I think that's both an important value and one that does have a sufficient relationship to the modifications to the Lottery Act itself. So the funding component is elsewhere? It's located not in that same section. Yes, correct. That's what I wanted to know. Oh, I'm sorry, Your Honor. Thank you. Yes, it's in a different section of the same act. I don't know what else to say about the appellate court's decision that we asked this court to reverse beyond the constitutionality of 9634. In our briefs, we've submitted that nobody has argued that there was a non-constitutional basis to invalidate these other acts. The appellate court seems to have seized upon that by itself and concluded as a matter of statutory interpretation that the contingent effectiveness clauses in those other acts somehow mean that if 9634 was declared unconstitutional, that the legislature intended all of those other acts to fall. And we have submitted an argument that that's not a correct conclusion as a matter of statutory interpretation. The plaintiffs have not disputed that. They've simply said incorrectly that the appellate court declared all those other acts unconstitutional, and it did not do so. It, in fact, specifically said it was not declaring those other acts unconstitutional. But that does bring us to the question of whether those other acts ---- Excuse me. I'm sorry I delayed you a little there, but your time has expired. Do you want to conclude? No, Your Honor. On that basis, subject to any questions the Court has in rebuttal about the various other constitutional challenges the plaintiffs have, I urge the Court to reverse the appellate court's judgment and uphold under single-subject clause analysis all of the challenged acts. Thank you. Thank you, Your Honors. Counsel for the appellees. Please. May it please the Court, I'm Sam Vinson from Ungrady and Harris, representing the taxpayers, Rocky Woods and the Woods Beverage Company. In the spring of 2009, as you've heard, the General Assembly passed five bills imposing increased taxes, authorizing video poker, and expending the revenue on both capital and operational concerns of state government. In mid-July, the Governor approved them. Within 32 days, on August 25th, taxpayers filed a petition with a complaint challenging four of those five acts. Those acts violate three fundamental rules of our Constitution. Our Constitution prohibits substantive language in appropriation bills. It requires that taxes be levied uniformly on both the objects and the subjects taxed, and it requires that acts be confined to a single subject. It doesn't do that by accident. Mr. Vinson, can I ask you three questions? You can incorporate them into your argument if you want, any way you want. Yes, sir. I have three questions that seem to at least make this a little bit different than the typical single subject challenge. Yes, sir. I think that will become apparent in the questions, and tell me what difference this makes, if any. And I'll go through them quickly. The first is this is a once-in-a-decade capital works bill. I mean, by its very nature, it's going to be enormous, right? I mean, there's no dispute as to that. And it contains a variety of creative legislative means to finance it. So the first question is, why would the financial part not be a necessary element of the capital projects bill? The second, these are somewhat related. The legislative history apparently contains not a single accusation of log rolling, which we typically see in single subject. In fact, it appears that the history reveals a rare level of bipartisan unity all around drafting and passing this major capital works bill. And then similarly related to that is, again, in a lot of these single subjects rule type cases, there's some type of smoking gun where we see, come on, what's that doing in there? You know, that's the purpose of that. Difficult to pick out one in this. So that's the basic question. Does that impact on the argument at all? Yes, sir, I think you figured out the three most important questions on the case, for sure. And let's go at those. I'd like to go at them, if you will, in reverse order. The smoking gun. There's an absolute smoking gun. There are two smoking guns, in fact. The first smoking gun is the $245 million diverted from capital projects to general revenue. And that $245 million is by no means offset by an equivalent $245 million backed out of road funds that have gone previously for operations. First, pardon me, road funds can be paid for operations. The state has not told you that the road funds are going for capital, and the state has not told you that the road funds are not going for operations. They can be used for operations, it says so precisely in 8.3 of the State Finance Act, the road fund section. Secondly, the $245 million that they allege backed out is not $245 million at all. The statute that they passed, and on the face of the statute you can identify it, only permitted $30 million to be used for the Secretary of State in fiscal year 2010, and $50 million to be used by the State Police in 2010. There are maxes in the statute that pass. So in order to get to the argument that the state makes about a $245 million back out, you have to turn legislative history or the law of legislative intent on its nose. What you have to decide, you have to reason that legislative intent is not something that you get from a bill, but something that you get from what the legislature might have done or had done in the past, not something from a bill. There is no $245 million transferred out. Third, the state talks to you about Public Act 9642 in their final brief, and the fact that there was language in that brief suggesting, in that appropriation bill, suggesting that the $245 million was substituted. What the state does not tell you is that four bills later, in 9646, an appropriation bill signed into law by the governor, there are numerous appropriations, very substantial amounts, to the Secretary of State and to the State Police. You can't define legislative intent from totally different bills because they conflict. There's no ambiguity whatsoever in 9634, the omnibus bill, that had the previous limits. It shows the previous limits that were in law, and it's law that actually compels what can be spent and what can't be spent. So I think in reaction to smoking guns, that's one. The second smoking gun is that both the omnibus and the appropriations bill contained clauses in them that required that they would not go into effect at all unless the other bill went into effect. That is log rolling in the worst way. As, for instance, this court held in the Kirk v. Lindbergh case, the worst situation you can face is late in the budget year, where the things are put into budget bills, into appropriation bills, that don't belong in appropriation bills. Substantive language. In this case, the language saying that the appropriation bill would only go into effect if the omnibus bill, 9634, went into effect. Now, what that Siamese twin conjoining of these two bills accomplished was it put the governor in a position where he essentially was stripped of his veto powers. He could not exercise the line item veto, he could not exercise the reduction veto, and he could not exercise the amendatory veto to get rid of that language in the appropriation bill. You held that in Kirk v. Lindbergh. Further, if he wanted to get the general revenue money, the $245 million, or conceivably it's as little as $160 million, if you do my $80 million number, if he wanted to get that general revenue money, he had to sign those bills to get it. And he had to sign both bills. He had to sign every project that the legislature wanted. And he had to accept video poker, a vast expansion of gambling that is truly remarkable. Now, I think, number, your second question was a question that there doesn't seem to be any particular problem with the provisions in the bill. And I would say that the linkage provisions are clearly a perfect example of a problem that, a single subject problem. The single subject problem in the linkage provisions is that what it does is it, as I said, strips the governor of his veto, but it also tells every legislator on the floor that with both of those bills going into effect, they'll get every project they ask for in the appropriation bill. Let me quote to you just briefly what the sponsor said. The sponsor said, the four leaders have got together and worked out funding for capital. It's not easy voting for taxes. Quite frankly, there are parts in here I don't want. There are parts in here I would prefer not to be here. Well, your honor, that is really the way in which you have defined log rolling. When you put riders into a bill and attach them to something popular and require that the legislature vote on those in total, consider the whole package, and then present that whole package to the governor, you've not only log rolled the legislature and told each member that if he wants the project he wants or if he wants the source of revenue he wants, perhaps a member wanted video poker, perhaps a lot of members didn't. We know the record on what's happened with video poker. Counsel, Mr. Vinson, when you said that they were unhappy but you didn't finish, they did all vote for it. Well, if you're in a position where the only way you can get your project is to vote for the package, that defines successful log rolling. But doesn't it also define that they were reached through compromise and the goal of putting people back to work and what the subject was probably the desire of the legislature to do that? There are certainly situations where people reach compromises, and in our society they have to reach compromises. But a compromise where you have to vote for things that are unpopular in order to get things that are popular is a mistake. What test does this court utilize in determining whether or not the legislation is a single subject, relates to a single subject? I'm sorry, ma'am, I didn't hear you. What test do we apply? Do we have a test that we look at to see whether or not the legislation is related? You've applied essentially a germaneness test. Whether or not the provisions in the bill are logically connected to the bill. And you've applied that test, maybe the best leading case is Coutinello. And in Coutinello what you found was that yes, a bill can include a provision that naturally supports the purpose of the bill, the single subject. What that was in Coutinello is interesting. Coutinello was a transportation bill. And what you applied that term to, that germaneness ruling to, was the fact that Coutinello required financing. It raised the taxes in order to pay for transportation. But it didn't funnel money off away from transportation to other projects. And it didn't funnel money off away from transportation to the general revenue fund and the government operations. It stuck with transportation. All the money went to the RTA, went to state highway authorities, went to the toll highway authority, and went to the local road districts, counties, and municipalities for road use. That is fundamentally different than saying, for example, in what we discussed earlier, or what was discussed earlier I should say, the question about the study, the University of Illinois study on the lottery. Coutinello could have had an amendment in it that said we're going to study taxes, the sales tax, to see whether it's too regressive. But it didn't. It didn't at all. And that's not what that ruling was applied to. And I would simply submit that doing studies on the fairness of taxes, the appropriateness of taxes, is certainly not something, and especially when those taxes flow not only to capital projects, but also flow to operations of government, public aid, children and family services, agencies we're all familiar with, desirable things. But when that amendment deals with the fairness of tax, much of which goes to operations, it's not an amendment directly connected to the question of a capital project. Counsel, do you submit that if there is a single subject violation with regard to any of these bills, they all go down? I would say that if there's a single subject violation with regard to the omnibus 9634, then the omnibus goes down and certainly the appropriation bill goes down because it's tied to the omnibus. In the very language of the omnibus and the appropriation bills, it says that if one goes down, the other goes down. I'd also say that in practicality, 9637, what the legislature called the Budget Implementation Act or the BIMP, it would go down as well. And it would go down because it largely retraces many of the provisions in the omnibus. It changes the implementation of the tax dates. It has a series of its own special problems in that it creates a consumer protection provision for consumers who deal with rental car companies, completely unrelated to this purpose. And when it recovers, goes back over the ground of so many provisions that are in the omnibus 9634, then it falls because of those as well. Those provisions cover the map, operations spending, capital spending, as well as these numerous other things we've cited that are really rather small things, probably designed to get individual votes. Mr. Vinson, would it be difficult for a capital bill of this magnitude to ever be passed that would not be in violation of a single subject? Well, in 1971, I believe, there was a substantial transportation bill passed that this court approved, Ogilvy v. Lewis. Now, it confined itself to bonding and bonding provisions and to making the money available. And in Coutinello in, I think, 1991, you approved another very major transportation program that you upheld on single subject, and it confined itself to raising taxes for transportation and distributing the money to transportation agencies. Yes, I think it can be done. I think it can pass a bill that raises the taxes. I think it can pass a bill, a second bill, that creates the project. I think it can pass a third bill that does the appropriations. I don't think you have to tie those things together. I recognize that there were special circumstances that surrounded the passage of this bill. The governor had been impeached and removed. A new governor had taken office. It may well be that elements of trust were missing across the street that would typically be in place. And because of that, perhaps people wanted to be able to vote not just for the taxes, but for the projects at the same time. And they wanted provisions in the bills that guaranteed everything to them. But I'd submit to you, very respectfully, Your Honor, that the most disastrous thing that can occur in our society is not that a particular program be delayed, and it can certainly be recovered by the legislature repassing the thing with curative legislation overnight. And, in fact, there is curative legislation that's passed the Senate, it's in the House, and it's out of House committee and in a substantive committee. Probably if you were to rule from the bench today on these bills, you'd see legislation passed by Memorial Day that solved most of these problems. But I'd submit that there is a much more substantial issue at stake here, and that is that the single subject rule, the appropriations, the no substantive language in appropriations, those kinds of rules are so fundamental to making the legislature and our society operate appropriately that the bigger catastrophe would be for the court to skimp on the enforcement of those rules. When you tell the legislature they need to do these things, they do them. They do them carefully. And it's not a case of you having to intervene and go over there and vote and police the legislature. It's a case of you finding exorbitant examples of legislative convenience. And convenience isn't the best way to run a legislature or to run government or to run a society. Constitutions are. He asked this question, if we were to disagree with you, if we were to find that this set of bills do not violate the single subject rule, what happens next? Well, I would certainly hope that you would find that it violates the substantive language and appropriation bills and throw the package out on that basis. And if you didn't do that, I would certainly hope that you would find that the liquor tax is not uniform because the state has not survived the burden shift in the liquor tax. So you believe that then we would have to go forward and address the other issues that were raised in the proposed complaint? I believe that you should, yes. Would a factual record be necessary to resolve the uniformity challenge since this was decided, was really decided on the basis of whether leaves should be granted to file the complaint? What's happened in the uniformity case at this stage is this. The legislature raised the tax on beer, 4.6 cents a gallon.  It's a tax on the occupation of distributing beer. They raised the tax on the occupation of distributing wine, 60 cents a gallon. And they raised the tax on the occupation of distributing spirits, $4.05 a gallon. We allege those are vastly disproportionate taxes and that those taxes are inappropriate and don't meet the standard. And the standard is, everybody knows, is that there have to be clear differences amongst both the subjects and the objects of taxation in this kind of taxation. So we could decide that based upon, as a matter of law, based upon the briefs? Because the state has not satisfied its burden shift under the uniformity process. When we allege and the state defends, and the state has said here that its defense is that this is for temperance purposes. The state hasn't satisfied its defense because you have said, in Wechsler v. Wirtz, that there is no assumption of pass-through to the consumer in this liquor tax. If there's no pass-through to the consumer, there's no impact on the consumer. And if there's no impact on the consumer, there certainly cannot be a temperance effect. If there are no further questions, your time has expired. Thank you. May it please the Court, I want to respond to some of the points made by opposing counsel. And certainly I want to answer any questions the Court has, even if they're not related to opposing counsel's arguments. I think it is important to focus on the contingency clauses.  They're the ones that are in the statute. But the characterization of the contingency clauses, certainly the one in the appropriation bill, as a rider that incorporates substantive law into that appropriation bill is incorrect. It is not a rider. The effect of that contingency clause is not like a rider where, if you pass the appropriation bill, this other substantive law takes effect. The contingency clause says, if that other bill doesn't become law, this appropriation doesn't go forward and money isn't spent. There's a logical reason for that. And that is that, as the legislative history discloses, it's sometimes easy to vote for spending and hard to vote to raise taxes. But if the legislature decided that this capital program was necessary and they weren't going to just pile on additional billions of debt to fund those programs, they needed new revenues. Those were the hard votes. And the appropriations bill essentially says, if there aren't revenues there because you didn't vote for them, this spending isn't going to happen. That makes perfect sense. Now, it's a case of first impression in this court. And to the extent it goes beyond the single subject clause and relates to the substantive law and appropriation claim that they have that wasn't addressed by the appellate court, we believe that their prayer and their complaint to enjoin appropriations under the fiscal year of 96-35 is moot because that's happened. There's no mootness exception that would apply to their claim to try and pursue that theory here. But I want to submit that if the court finds that it wants to address and will at this phase of this case address that issue, I urge it to examine the Florida Supreme Court's decision, although it may be a case of first impression in this court. It's cited at page 16 of our reply brief. It addresses this exact issue. And it says, for reasons that I think Justice Schaffer in the Lindbergh decision makes clear, that it is not impermissible to have a contingency for an appropriation clause, provided that contingency is related to the subject of appropriation. And further provided, if that contingency is another bill, that there be a direct and relative interdependence between the two. Why is that important? Because it prevents the type of log rolling rider type problem that Justice Schaffer referred to. When the legislature needs to fund its operations, you don't want somebody shoehorning in a substantive provision that is not related to the subject of appropriations. But if, as in this case, you have a capital program where the appropriations are put out and you need the revenues to pay for them, there is a direct and logical relative interdependence between those. It's common sense. You can't spend the money unless you have it. These bills and that contingency clause essentially made explicit what was already implicit. The appropriations weren't going to go anywhere if the legislature didn't pass the revenues. So on that issue, I urge the court, if it reaches that question, to look carefully at that decision. It has been approvingly cited by every other jurisdiction that seems to have focused on the issue. I have not seen any contrary authority. And it is, I believe, harmonious with the decision in Cutinello that included both revenues and projects as part of a single subject analysis. Here again, we have multiple components of a large capital program. You've got to have the revenues. You've got to have the programs authorized. You've got to have the financing mechanism. And you've got to have the appropriations. And although capital projects require multi-years of appropriations, this appropriations bill appropriately was limited to the first fiscal year. Beyond that, those appropriations of that fiscal year was expired even when the appellate court issued its decision. So if there's a mootness issue, it also applied at the time of that decision as well. On the statutory interpretation issue, I would disagree with the notion that if 9634 goes down, then as a matter of statutory interpretation, the other bills go down. I think that the language used was not like a severability clause that is intended to deal with the question of a finding of unconstitutionality. It uses the language essentially of the Constitution with respect to the passage of a bill. And that is what the language says. Each of those bills was in fact passed, notwithstanding the fact that if the court declares 9634, there may be curative legislation for it, and we'll have to see whether that's necessary and what that would look like. It doesn't carry with it the invalidity of all of the other bills that have contingency provisions in them with respect to whether 9634 or the House Bill 255 became law. The veto problem I submit is nonexistent in this case. The Governor's veto powers were just as preserved as they were. Without these contingency clauses, both the line item veto and the reduction in appropriation veto and the general veto power were all respected in this case. So that addresses the second smoking gun argument? That was the contingency clause provision? Well, Mr. Vinson said there's two smoking guns that are log rolling problems, and I believe he said the one where the appropriation is linked. But that's also true, I think, with respect to all the other provisions. And under a single subject clause analysis, our position is that if the permissible single subject of 9634 and all these other bills is the capital program, then the fact that all of these bills do have provisions that relate to that same subject doesn't render them invalid on a single subject theory either. But my question was, is that your response to his example of what's one of the most extreme problems? You're saying that the single, not single, but the line item veto under your reading still is preserved? Or was preserved? He both urged it as a smoking gun with respect to the single subject clause analysis, but he also said that it somehow violates the Governor's veto powers. And I answer that it does not in substance violate the single subject clause, but likewise I add that it does not violate the veto provision of the Constitution, which is one of the other claims the appellate court did not address. I also want to briefly touch upon the uniformity of taxation clause to answer Justice Garmon's question. A trial is not required to address the wisdom of the legislative judgment that higher per drink taxes at the wholesale level on stronger alcoholic beverages promotes the stated goal in the Liquor Control Act of temperance. The differential is approximately two and a half and four and a half on the per drink taxes at the wholesale level between beer, wine, and whiskey. It's 2.2 cents a drink for beer, 5.4 cents for wine, and 10 cents per whiskey. And the idea that they're going to call their first witness and try and disprove the legislative judgment, and the test for that is could the legislature reasonably have conceived of facts pursuant to which that judgment was permissible? This is a question of law for the court to decide. We're not going to have witnesses get up on the stand and say, oh, the legislature is clearly wrong about higher taxes getting passed through to the retail level. They couldn't reasonably have conceived that that was possible and that higher taxes translating into higher retail prices reduce the consumption of those things that are taxed the most. This is within the legitimate realm of legislative judgment. You don't have courtroom fact finding to refute that, and I think the Empress Casino case essentially makes that clear in a uniformity clause context. And Wexler is an opposite. It simply said that for standing purposes, because the court isn't required to assume legally that taxes imposed on the wholesale level are borne by a downstream consumer giving them standing as a taxpayer on the Protest Monies Act, that doesn't translate into a finding that the legislature couldn't reasonably believe that higher wholesale taxes trickled down through the chain of distribution to higher taxes at the retail level. I think I've answered the major questions prompted by opposing counsel and by the court. Counsel, how about the second one? Maybe you touched on this and I missed you, but the argument Mr. Vinson made about the diversion of general funds to road funds, the $245 million. Right. What he's saying is that the legislature should ignore what it actually was doing and pay attention to what it said it should do and repeatedly changed and didn't do year after year. That's prong one of their argument. Prong two of their argument is that monies in the road fund can be used for any purpose, including operations, and therefore it doesn't properly relate to capital programs. I simply think that that's wrong and the court can disagree. Although road fund monies do sometimes are used for planning and design and related operations with respect to transportation, the primary function of the road fund, which includes revenues that come from the federally imposed tax on gasoline, is related to transportation facilities and operations. And the reality is that the vast majority of that relates to building, maintaining, and operating the roads and bridges and highways in the state. That's within the purview of the capital program. Ever since these bills were passed, there's been $1.6 billion in bonds payable out of the transportation bond fund that is paid for directly out of the road fund. To say that the legislature was engaged in some type of shell game manipulation to try and just generate revenues for the general revenue fund that could be used for any purpose, I think, is contradicted by the face of the statute, as well as the pragmatic history of the operations of these various funds. And I urge the court again to reverse the appellate court's judgment, to hold that all these statutes satisfy the single subject clause, and if the court does go beyond those issues and reach the other claims by the plaintiffs, I urge the court to affirm the decision of the circuit court concluding that as a matter of law, they had not stated reasonable grounds for proceeding on those claims. Thank you, Your Honors. Thank you. Case number 111903, Wirtz v. Quinn. Agenda number 12 is taken under advisement. This concludes our oral argument document for May 2011. Mr. Marshall, the Illinois Supreme Court stands in adjournment.